John M. Snell
PO Box 142
San Geronimo, CA 94963-0142

3 Sept. 2024

Re: TJTM Technologies, LLC, Plaintiff v. Google LLC, Defendant
U.S. Patent No. 8,958,853
Case No. 24-cv-01232-TLT
Order Granting Motion to Dismiss

I have been asked by the law firm Cotchett, Pitre & McCarthy, LLP for the plaintiff (TJTM Technology, LLC) to review the Motion to Dismiss, and documents related to infringement of US Patent 8,958,853. This letter offers my opinions, on which I would testify if needed. My opinions are based upon the information and documents which I have considered to date. I reserve the right to supplement these opinions in the future to respond to arguments and take into account new information which becomes available to me.

**Relevant Experience**:

I am an engineer with 5-decades of experience in design and analysis of microelectronics, software, and systems for processing and transferring audio and data over electronic networks. I have researched, designed, developed and analyzed numerous digital audio systems, including mobile wireless communication systems.

I wrote my first computer program in 1968 on a mainframe computer at Carnegie-Mellon University (CMU), where I studied from 1967-1974. I have programmed computers and digital media systems at all levels, from high-level languages down to assembly code, microcode and binary. My first work in telecommunication systems was a 1971 internship in the engineering department of WQED (PBS) in coordination with CMU.

In the early 1970s, I developed microelectronics and software in the Engineering Lab of the Carnegie-Mellon University Artificial Intelligence Lab, and transmitted and received digital audio with the AI Lab at Stanford University over the ARPANET (Internet predecessor) via AT&T telecommunications lines. At ARGOSystems I co-designed the microelectronics and software of a real-time wireless microwave signal analyzer which was used (long before wireless phones) in mobile defense applications in the mid-1970s.

I researched digital audio signal processing from 1977–1980 at the Center for Computer Research in Music and Acoustics (CCRMA) at the Stanford University AI Lab. I developed their mainframe computer for editing, signal processing, auditioning, transmitting and receiving digital audio files over the ARPANET.

I am the Founder (1976) and original Editor of an academic publication (MIT Press) of international research, applying computer science, physics, signal processing mathematics, microelectronics and software engineering, acoustics and perceptual psychology to audio engineering.[1] Several books *Digital Audio*

---

[1] *Computer Music Journal*, MIT Press.

*Engineering* (Kaufmann 1985), *Digital Audio Signal Processing* (Kaufmann 1985), and *Foundations of Computer Music* (MIT PRESS 1985) were published from related articles I edited with J. Strawn and C. Roads.

I was an engineer from 1980–86 at Lucasfilm Ltd., where we designed and developed the microelectronics and software of multiprocessor supercomputers for recording, processing, filtering, editing and transferring digital audio. Here I also researched microphone technology, designed the first programmable digital mixing console and developed Lucasfilm's real-time Digital Audio Signal Processor (ASP, SoundDroid) with transmission of digital audio over private Ethernet.

I designed several real-time multiprocessing systems for processing digital media signals[2 and 3] and wrote a book,[4] providing my engineering system designs for processing digital audio and video. In 1989, I was invited to give an international presentation on real-time software design issues in programming multiprocessor systems, published by the Audio Engineering Society.[5] I also gave digital audio design seminars for Sony Advanced Development (Tokyo) engineering teams, and designed digital audio systems for Sony. I have also worked on the design of applications for iPhone and Android smartphones.

Serving from 1992–95 on the Editorial Review Board of *Microprocessor Report*, I analyzed the internal design of state-of-the-art digital media processing chips and advanced memory chips for this highly-respected publication on integrated circuit design for electrical engineers and computer scientists. I was honored by the Audio Engineering Society in 2000 with a Fellowship Award for innovative digital audio processor design and valuable contributions to the advancement of audio engineering.

I have analyzed hundreds of patents and have served as an expert witness in trial and deposition in numerous patent cases on processing digital media and telecommunications. I testified on my analysis of software and microelectronics design of systems for reception and processing of telecommunications signals at the 2017 International Trade Communication trial of Broadcom v. SigmaDesigns. And I testified in deposition on my analysis of Apple digital audio/video technology in a PTAB telecommunications case.

In patent cases I have analyzed the microelectronics and software design of mobile phones (LG Electronics, Nokia, Motorola, Blackberry, Apple, IBM and others) as well as the software and routing microelectronics of telecommunication networks (including Nortel Networks) used for cellular communication. And I have analyzed the design of software and microelectronics in telecommunications patent cases involving Charter Communications, Comcast, ECHOSTAR Communications, Hughes Electronics, DirectTV, Thomson, Pegasus Satellite, and Apple. I have also analyzed the intellectual property of mobile audio for vehicles.

---

[2] John M. Snell, Expandable Interactive Real-time Multiprocessor DSP, *Proceedings of the IEEE* (Institute of Electrical and Electronics Engineers) *ASSP* (Acoustics Speech and Signal Processing) *Workshop on Applications of Signal Processing to Audio and Acoustics* ( IEEE Press 1989).

[3] John Snell, Professional Real-time Signal Processor for Synthesis, Sampling, Mixing & Recording, *Proceedings of the 83rd Convention of the Audio Engineering Society* (Audio Engineering Society 1987).

[4] John M. Snell, *Multiprocessor Architectures & Design Techniques for Media Signal Processing & Synthesis* 1991–1995 (Timbre Engineering 1995).

[5] John M. Snell, Multiprocessor DSP Architectures & Implications for Software, *Audio in Digital Times* (Audio Engineering Society 1990).

The National Science Foundation sponsored my interdisciplinary graduate work through the Electrical Engineering Dept. of Carnegie-Mellon University.  I earned degrees in Electrical Engineering and Cybernetics at Carnegie-Mellon University, and studied the advanced mathematics of digital audio signal processing at Stanford University.  In addition to electrical engineering courses in semiconductor physics (integrated circuit design) and telecommunications (wireless design), graduate and undergraduate courses were completed in computer science, the physics of sound, music and perceptual psychology focused on auditory anatomy and neural response.  My education and career provide expert experience for analysis of this case.

## Motion to Dismiss

If an invention is not disclosed in the language of mathematics or software code, is it merely an abstract idea?  The design of an invention may be disclosed via diagrams, flowcharts, mathematical equations, software algorithms or language, including Verilog chip design code, assembly language, C, C++, or other high level languages, including English, to define the structure and functionality.  In addition to diagrams and flow charts, examples of disclosure of the design technology are included in the following quote from the '853 patent.

"Referring back to FIG. 2, the mobile device 100 includes a memory interface 102, one or more data processors, image processors and/or central processors 104, and a peripherals interface 106. The memory interface 102, the one or more processors 104 and/or the peripherals interface 106 can be separate components or can be integrated in one or more integrated circuits. The various components in the mobile device 100 can be coupled by one or more communication buses or signal lines, as will be recognized by those skilled in the art.
Sensors, devices, and additional subsystems can be coupled to the peripherals interface 106 to facilitate various functionalities. For example, a motion sensor 108 (e.g., a gyroscope), a light sensor 110, and a positioning sensor 112 (e.g., GPS receiver) can be coupled to the peripherals interface 106 to facilitate the orientation, lighting, and positioning functions described further herein. Other sensors 114 can also be connected to the peripherals interface 106, such as a proximity sensor, a temperature sensor, a biometric sensor, or other sensing device, to facilitate related functionalities.
A camera subsystem 116 and an optical sensor 118 (e.g., a charged coupled device (CCD) or a complementary metal-oxide semiconductor (CMOS) optical sensor) can be utilized to facilitate camera functions, such as recording photographs and video clips.
An audio subsystem 122 can be coupled to a speaker 124 and a microphone 126 to facilitate voice-enabled functions, such as voice recognition, voice replication, digital recording, and telephony functions.
The I/O subsystem 128 can include a touch screen controller 130 and/or other input controller(s) 132. The touch-screen controller 130 can be coupled to a touch screen 134. The touch

screen 134 and touch screen controller 130 can, for example, detect contact and movement, or break thereof, using any of a plurality of touch sensitivity technologies, including but not limited to capacitive, resistive, infrared, and surface acoustic wave technologies, as well as other proximity sensor arrays or other elements for determining one or more points of contact with the touch screen 134. The other input controller(s) 132 can be coupled to other input/control devices 136, such as one or more buttons, rocker switches, thumb-wheel, infrared port, USB port, and/or a pointer device such as a stylus. The one or more buttons (not shown) can include an up/down button for volume control of the speaker 124 and/or the microphone 126.

The memory interface 102 can be coupled to memory 138. The memory 138 can include high-speed random access memory and/or non-volatile memory, such as one or more magnetic disk storage devices, one or more optical storage devices, and/or flash memory (e.g., NAND, NOR). The memory 138 can store operating system instructions 140, such as Darwin, RTXC, LINUX, UNIX, OS X, iOS, WINDOWS, or an embedded operating system such as VxWorks. The operating system instructions 140 may include instructions for handling basic system services and for performing hardware dependent tasks. In some implementations, the operating system instructions 140 can be a kernel (e.g., UNIX kernel).

The memory 138 may include graphical user interface instructions 144 to facilitate graphic user interface processing; sensor processing instructions 146 to facilitate sensor-related processing and functions; web browsing instructions 152 to facilitate web browsing-related processes and functions; media processing instructions 154 to facilitate media processing-related processes and functions; GPS/Navigation instructions 156 to facilitate GPS and navigation-related processes and instructions; camera instructions 158 to facilitate camera-related processes and functions; and/or other software instructions 160 to facilitate other processes and functions (e.g., access control management functions, etc.). The memory 138 may also store other software instructions (not shown) controlling other processes and functions of the mobile device 100 as will be recognized by those skilled in the art. In some implementations, the media processing instructions 154 are divided into audio processing instructions and video processing instructions to facilitate audio processing-related processes and functions and video processing-related processes and functions, respectively. An activation record and International Mobile Equipment Identity (IMEI) 162 or similar hardware identifier can also be stored in memory 138.

Each of the above identified instructions and applications can correspond to a set of instructions for performing one or more functions described herein. These instructions need not be implemented as separate software programs, procedures, or modules. The memory 138 can include additional instructions or fewer instructions. Furthermore, various functions of the mobile device 100 may be implemented in hardware and/or in software, including in one or more signal processing and/or application specific integrated circuits."

['853 patent, col 11-12]

Timestamps set by software are disclosed in Figure 8 of the '853 patent to record the times at which a cell phone was in the inactive (do not disturb) mode. In addition to connecting with a vehicle Bluetooth wireless transmitter, the '853 patent disclosed connection with a certification server to record these timestamps.

"The certification server receives the inactive mode begin notification from the mobile device. The certification server may assume that inactive mode is operating continuously until receiving a signal, such as an inactive mode end notification, that inactive mode has been disabled. A certified record of the data contained in the inactive mode begin notification may be created and stored in a database of the certification server. The certified record may include a first timestamp of the time the inactive mode begin notification was received.

…

At the conclusion of inactive mode, the mobile device may transmit an inactive mode end notification to the certification server to indicate that the device has left the inactive mode. The inactive mode end notification may include a user identifier and a end timestamp marking the time that the mobile device was removed from inactive mode. Further, the inactive mode end notification may include a listing of functionality permissions to record the functionality made available and/or the functionality made restricted to the user during the inactive mode."

['853 patent, col 4, lines 24-33 and lines 42-51]

An inactive mode start time timestamp was sent to a certification server after the vehicle Bluetooth transmitter was used to initiate the inactive mode in the mobile device. All 3 devices combined to form an innovative solution to the problem of distracted driving triggered by mobile devices.

## Summary of the issue

Many vehicle accidents are caused by distracted driving while responding to mobile phone calls, email and text messages. The '853 patent specifies the design of an invention which combines the functionality of a mobile device with a vehicle to automatically put the phone in an inactive (do not disturb) mode while driving.

"the inactive mode may be automatically initiated upon the pairing of the mobile device and a vehicle." ['853 patent, col 2, lines 35-37]

Claim 1 of the '853 patent asserts:

"A mobile device, comprising:

   a wireless communication module;

   a processor, controlling the wireless communication module; and

   a memory controlled by the processor, the memory including instructions that when executed by the processor cause the processor to perform the steps of:

      providing a graphical user interface through which a user customizes one or more functions of the mobile device when placed in an inactive mode;

      receiving a user selection to automatically initiate the inactive mode in response to the pairing of the mobile device with a vehicle;

      receiving a user selection of an away message to use when the mobile device is in inactive mode;

      in response to the <u>pairing of the mobile device and the vehicle, automatically initiating a process to place the mobile device in inactive mode</u>;

      when the mobile device is in inactive mode, in response to receiving a communication from the wireless communication module, transmitting the user selected away message via the wireless module and suppressing one or more sound, visual, or vibration communication cues that would have accompanied the communication had the mobile device not been in inactive mode."

[ '853 patent, Claim 1, emphasis added]

### Is the technology claimed in the Atos case equivalent to that disclosed by the '853 patent?

     In the 19 August 2024 Order Granting Motion to Dismiss [8/19/2024 Dkt. No. 19, TJTM Technologies, LLC, Plainmtiff v. Google LLC, Defendant in Case No. 24-cv-01232-TLT], the Court referenced the 2021 case of Atos, LLC d/b/a Ridemetric, Plaintiff, v. Allstate Ins. Co., et al., Defendants [12/22/2021 US District Court, Northern District of Illinois 20-cv-06224]. In this Atos case, the Court based its opinion primarily on the US patent 8,527,140 (the '140 patent), which was representative of the other patents in the case. The technology of this patent "seeks to leverage the **internal sensors of portable devices, such as smartphones**, to observe a vehicle's movements." [12/22/2021 *Memorandum Opinion and Order*, by Andrea R. Wood, US District Court, Northern District of Illinois 20-cv-06224, emphasis added] The '140 patent is directed to sensing vehicle status without using equipment within the vehicle (e.g. wireless) or external networks like GSM.

     "Yet other alternative includes getting signal from the car to provide the notice that the car has stopped and also may be the location information (REF? U.S. Pat. No. 6,392,592). Some signals

include **wireless signals**, change in current, opening of the door, etc for example (REF? U.S. Pat. No. 6,650,999).

**All of these have the problem of requiring a tight coupling with the car**, such that the system installation is cumbersome. Furthermore, if the user drives a car which does not have the same system pre-installed (e.g. rented car), the user cannot use the system.

Also it is not possible to directly use GPS in the above application to detect whether a car is parked or moving because GPS velocity detection cannot be directly used to distinguish between a user walking slowly and a vehicle being driven slowly. Furthermore, the GPS signal may not always be available."

[US patent 8,527,140 col 1, lines 27-42, emphasis added]

Rather than inventing a more complete machine by combining the mobile device with wireless networks in the vehicle and the GPS network, the technology of the '140 patent used sensors within a cell phone, like accelerometers. "the claims recite references to generic **sensors that the relevant portable device already contains**" [2021 Memorandum Opinion and Order, by A. Wood, US District Court 20-cv-06224, op. cit. emphasis added]  A cell phone is a type of computer.  As the '140 patent claims add no innovation beyond the functionality already in a cell phone, the Court determined that the '140 patent was an unpatentable abstract idea.

In contrast to the Atos case patents, the '853 patent technology combined a mobile device with a vehicle Bluetooth transmitter, GPS transmitters and a certification server.  A wireless signal from the Bluetooth transmitter within the driver's vehicle causes the driver's mobile device to automatically enter the inactive (do not disturb) mode in an embodiment of the '853 patent.  The start time (of the inactive mode) timestamp is stored in a certification server after the signal from a vehicle Bluetooth transmitter initiates the inactive mode in the mobile device.  The combination of all 3 devices formed an innovative solution to the problem of mobile phone distracted driving.  A certification server and the Bluetooth transmitter in the driver's vehicle are combined with a mobile device to effectively form a new machine which automatically enters the inactive mode upon connection with a vehicle to automatically suppress distracting communication.

### Is it practical for a human assistant to perform the '853 patent technology?

The '853 patent disclosed the combination of vehicle wireless technology with a mobile device to prevent the accident prone distractions of using a cell phone while driving.  As understood by a person of ordinary skill in the art, this invention enabled a do not disturb inactive mode to be reliably and consistently entered and exited within milliseconds, <u>automatically</u>. without compromising the privacy of the driver.

"in response to the <u>pairing of the mobile device and the vehicle</u>, <u>automatically</u> initiating a process to place the mobile device in inactive mode" [ '853 patent, Claim 1, emphasis added]

Why can't a driver consistently rely on a human assistant to <u>automatically</u> set a driver's mobile device in the inactive mode, promptly?  The time at which someone may need to drive or stop driving is not always predictable.  It is unrealistic to assume a human assistant would be available to be in the car with the driver any time of the night, on any day of the week or year.  A human assistant may not be available to be a passenger when sleeping, sick or impaired by alcohol or drugs, taking care of children or parents, or on vacation.  Unfortunately, a remote human assistant would not know whether the driver is driving.  When you arrive at your destination, how long would you wait for a remote human assistant to enable you to use your phone?  While in inactive mode, the driver would not be able to call the human assistant to ask her to turn off the inactive mode to enable the driver to use her cell phone.  Because a remote human assistant would not know when the driver started driving again, the human assistant would not be able to <u>automatically</u> enable the inactive mode.

Most people cannot afford to hire one assistant.  How realistic is it to require the user to hire a group of attentive human assistants to be available (sometimes in an unpredictable instant) as a passenger 24/7 all year, and pay for the assistant who must wait for you while parked for an hour, many hours or overnight to drive again?  And having a human assistant readily available 24/7 as a passenger would compromise one's privacy.  Compared to microelectronics and software, humans are too slow and inconsistent to be relied upon to disable or enable use of one's cell phone.

Human assistants cannot <u>automatically</u> turn on and off the inactive mode.

Riding in the car with the driver, how will a human assistant keep up with receipt of a rapid sequence of numerous phone calls, text messages and email, while attempting to respond to and keep records of each communication?  Microelectronics and software is designed to respond to each communication while keeping records.

Emotional distractions can be triggered through interactions with, and communication between human beings.  Distracting emotions hamper the ability to think clearly and respond to emergencies while driving.  To enable a user to identify the priority of different calls and messages, a mobile device generates different sounds for communication from different contacts.  After working with a driver for a while, a human assistant observes and remembers reactions by the driver to communication from her contacts.  Phone calls, text messages and email can be emotionally distracting when they contain financial, confidential or intimate information.  A driver would hear the distracting sounds on their mobile device used to alert a human assistant, and be distracted by the human assistant responses to such private communication.  The '853 patented solution removes the opportunity or temptation to interact with a driver's human assistant over her phone calls, email and text messages, thus reducing distracted driving.  A human assistant does not solve the problem of cell phone distractions while driving.

The '853 patented invention automated the process of connecting the phone and vehicle to automatically respond and keep records on a certification server 24 hours per day, 7 days per week, all year round, without distracting the driver.

### Conclusion

A human assistant cannot <u>automatically</u> turn on and off the inactive (do not disturb) mode. A human assistant is not always available when a driver needs to drive. A human assistant is ineffective in responding to and keeping records when too many communications are received at once while a passenger in the car. A remote human assistant would not always know when the driver stopped and restarted driving along a trip.

A driver may be emotionally distracted as a human assistant receives and responds to the contact identifying sounds of personal, confidential or intimate phone calls, text messages or email. While the technology of the '853 patent can impersonally, consistently, reliably and promptly respond to communications, a human assistant would not solve the problem of distractions from mobile devices while driving.

As the use of mobile devices in cars was becoming popular, the '853 patent disclosed unconventional methods to automatically reduce their distractions by combining a mobile device, vehicle technology, certification server and GPS transmitters. In contrast, the Atos patents were directed to solving a problem with technology inside the mobile device. The '853 patent disclosed an improvement over mobile phones at the time of the invention, which could reduce vehicle accidents and clarify insurance disputes.

My opinions are based upon the information and documents which I have considered to date. I reserve the right to supplement these opinions in the future to respond to arguments and take into account new information which becomes available to me.

Sincerely,

*John M. Snell*

John M. Snell